**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SHANTAY HEAVEN, individually and on behalf of all others similarly situated, | : | CIVIL ACTION NO. |
| Plaintiff, | : | Case No: 2:24-cv-04754 |
| v. | : | |
| PRIME HYDRATION LLC, | : | |
| Defendant. | : | |

**DEFENDANT PRIME HYDRATION LLC'S MOTION TO DISMISS PLAINTIFF'S CLASS ACTION COMPLAINT**

Defendant Prime Hydration LLC ("Prime") respectfully moves to dismiss the claim asserted against it in Plaintiff Shantay Heaven's ("Plaintiff") Complaint[1] pursuant to Federal Rules of Civil Procedure 12 and 19.

## INTRODUCTION

Plaintiff's Complaint against Prime should be dismissed with prejudice for multiple reasons. As an initial matter, Prime is a Delaware company with its principal place of business in Kentucky. Plaintiff has not alleged facts sufficient to confer this Court with jurisdiction over Prime, and dismissal is required. Plaintiff also fails to show that she suffered any concrete harm as required for Article III standing or to satisfy the requirements of the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA") as to Prime. Importantly, Plaintiff cannot establish concrete harm because she does not allege that any of her highly sensitive personal or financial information was obtained through her use of Prime's website. *See In re BPS Direct, LLC*, 2023 WL 8458245, at *12 (E.D. Pa. Dec. 5, 2023). Indeed, Plaintiff alleges only that she

[1] A copy of the Complaint is attached hereto as **Exhibit A.**

searched for Prime products when she visited Prime's website in February 2024. She also fails to show that any contents of communication protected by WESCA were intercepted.

Additionally, Prime's use of technology to collect and share information is not hidden as Plaintiff suggests. To the contrary, Prime's website includes a privacy policy that specifically informs all users of this fact. Plaintiff herself sought out and used Prime's website, and by doing so, impliedly consented to its privacy policy. "Reasonable people understand that what they do on the Internet is not completely private. How could it be?" *Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 230 (M.D. Pa. 2023) (citations omitted). Further, Plaintiff created a Facebook account ten years ago, providing her private information, birth date, and other highly sensitive information to Facebook, owned by Meta. She admits in her Complaint that Meta tracks her activity on and off its site. She agreed to Meta's policies by creating her Facebook account in 2014. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 786 (N.D. Cal. 2022). Further, Plaintiff has not alleged that the communications were allegedly intercepted in Pennsylvania. Finally, Plaintiff has failed to join necessary parties Meta and Google to this lawsuit, requiring dismissal of the Complaint. For these reasons, Plaintiffs' Complaint against Prime should be dismissed with prejudice.

**STATEMENT OF FACTS**

Prime sells sports and energy drinks to consumers in multiple countries and states, including Pennsylvania. Plaintiff has asserted a claim against Prime for an alleged violation of WESCA in connection with her alleged visit to Prime's website in February 2024, when she searched for Prime products. (Compl., Count I; ¶ 8).

Plaintiff Heaven created a Facebook account ten years ago, in 2014. (Compl. ¶ 8). In her Complaint, she admits that Facebook, owned by Meta, requires its users to share "the name they

go by in everyday life," and to enter their first and last name, birth date, and gender when creating an account. (Compl. ¶ 25). Crucially, Plaintiff admits that "Meta can target users so effectively **because it surveils user activity both on and off its site**," citing the Meta Business Help Center's website. (Compl. ¶ 27 and n. 8) (emphasis added). Plaintiff further admits that she uses the same browser to access her Facebook account. (Compl. ¶ 8).

Though she voluntarily gave Meta her highly sensitive personal information, and Meta has been tracking her activities on and off its site for the past ten years, now Plaintiff has sued Prime – based on a single search she conducted in February 2024 – because Prime allegedly has a partnership with Meta and Google. (Compl. ¶ 8). Plaintiff alleges only that she entered search terms for Prime drink flavors, "ice pop," meta moon," and "blue raspberry" on Prime's website. (Compl. ¶ 8). She does not allege that she made any purchase or provided Prime with any highly sensitive personal information that could have been "intercepted" by Meta or Google. *Id*.

Instead, the majority of Plaintiff's Complaint describes the *capabilities* of Meta and Google Analytics in tracking users across multiple websites and compiling that information. (Compl. at ¶¶ 24-56). But Plaintiff does <u>**not**</u> connect those *capabilities* to the actual collection of any highly sensitive personal information or financial information ***from her use of Prime's website***. (Compl. ¶ 8). Indeed, Plaintiff alleges only that she "used the search bar on [Prime's] Website to search for different Prime drink flavors" and that "[h]er search bar communications were intercepted in transit by Meta and Google – as enabled by Defendant." (Compl. ¶¶ 8, 61).

Plaintiff further asserts that the "wiretapping of Plaintiff and Class Members occurred in Pennsylvania, where Plaintiff and Class Members accessed [Defendant's] Website and where the Meta Pixel and Google Analytics – as procured by Defendant – routed Plaintiff's and Class Members' electronic communications to Meta and Google's own servers" (Compl. ¶¶ 91, 92).

She also conclusively alleges that Prime, by "conduct[ing] customer outreach including direct online outreach, marketing and sales, located in the Commonwealth of Pennsylvania…[and] continu[ing] to market for sale in the Commonwealth of Pennsylvania" that it "has at all times continued to avail itself of the laws of the Commonwealth of Pennsylvania." (Compl. ¶ 11).

Prime's website includes a written Privacy Policy, which users can access when visiting Prime's website ("Privacy Policy").[2] Users agree to the terms of the Privacy Policy by using Prime's website. The Privacy Policy also states that Prime:

> **[R]eserves the right to collect use and user statistics from the Site. Use and user statistics will be used to track information such as visitor interests**, which may be used to enhance and improve the Site in the future or for marketing purposes; however, such use and user statistics do not include personally identifiable information. Generally, no personally identifiable information is tracked or collected on the generally accessible portions of the Site, unless you voluntarily provide such information to us via webforms or surveys on the Site.

(emphasis added). Pertinent to the allegations in Plaintiff's Complaint, the Privacy Policy expressly discloses that Prime may collect information when users utilize its website, including information:

- By which you may be personally identified, such as name, postal address, e-mail address, telephone number, or any other identifier by which you may be contacted online or offline ("personal information").
- That is about you but individually does not identify you.
- About your internet connection, the equipment you use to access our Site, and usage.
- Directly from you when you provide it to us.
- ***Automatically as you navigate through the site. Information collected automatically may include usage details, IP addresses, and information collected through cookies.***
- Information that you provide by filling in forms on our Site. This includes information provided at the time of registering to use our Site, subscribing to our service, posting material, or requesting further services. We may also ask you for information if you report a problem with our Site.

---

[2] A copy of Prime's Privacy Policy is attached hereto as **Exhibit B**. Further, the Privacy Policy is available for review by any consumer that accesses Prime's website at: Privacy policy - PRIME (drinkprime.com).

- Records and copies of your correspondence (including email addresses and phone calls), if you contact us.
- Your responses to surveys that we might ask you to complete for research.
- Details of transactions you carry out through our Site.
- ***Your search queries on the Site.***

(emphasis added). Further, Prime's Privacy Policy also contains the following statements about data that it may automatically collect from website users:

- **Cookies (or browser cookies).** A cookie is a small file placed on the hard drive of your computer. You may refuse to accept browser cookies by activating the appropriate setting on your browser. However, if you select this setting you may be unable to access certain parts of our Site. Unless you have adjusted your browser setting so that it will refuse cookies, our system will issue cookies when you direct your browser to our [*sic*].
- **Flash Cookies.** Certain features of our Site may use local stored objects (or Flash cookies) to collect and store information about your preferences and navigation to, from, and on our Site. Flash cookies are not managed by the same browser settings as are used for browser cookies.
- **Web Beacons.** Pages of our Site may contain small electronic files known as web beacons (also referred to as clear gifs, pixel tags, and single-pixel gifs) that permit the Company, for example, to count users who have visited those pages or and for other related Site statistics (for example, recording the popularity of certain Site content and verifying system and server integrity).

With regard to third party use of cookies and other tracking technologies, the Privacy Policy provides:

> Some content or applications, including advertisements, on the Site is served by third parties, including advertisers, ad networks and servers, content providers, and application providers. ***These third parties may use cookies to collect information about you when you use our Site***. The information they collect may be associated with your personal information or they may collect information, including personal information, about your online activities over time and across different Sites and other online services. They may use this information to provide you with interest-based (behavioral) advertising or other targeted content. ***We do not control these third parties' tracking technologies or how they may be used. If you have any questions about an advertisement or other targeted content, you should contact the responsible provider directly.***

(emphasis added). While Prime does not control the third-party collection or use of user information, the Privacy Policy states that "these third parties may provide you with ways to

choose not to have your information collected or used in this way. You can opt out of receiving targeted ads from members of the Network Advertising Initiative ("NAI") on the NAI's Site."

The Privacy Policy makes clear that Prime may "disclose aggregated information about [its] users and information that does not identify any individual, without restriction." However, users may "review and change your personal information by logging into the Site and visiting your account profile page. ***You may also send us an email at contact@drinkprime.com to request access to, correct or delete any personal information that you have provided to us***." (emphasis added).

**ARGUMENT**

**I. <u>Pennsylvania does not have personal jurisdiction over Prime, and Plaintiff's claim against Prime must be dismissed.</u>**

Plaintiff has failed to establish that this Court has personal jurisdiction over Prime. There is no general jurisdiction over Prime in the Commonwealth of Pennsylvania because Prime is not considered "at home" in Pennsylvania. Specific jurisdiction is also lacking because the exercise of personal jurisdiction over Prime is improper under both the traditional "contacts" analysis and the *Calder* effects test. *See Calder v. Jones*, 465 U.S. 783, 788–90 (1984).

To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff bears the burden of establishing the court's jurisdiction over the moving defendants. *See Steinfield v. EmPG Int'l, LLC*, 97 F. Supp. 3d 606, 611 (E.D. Pa. 2015) (citing *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004) (citation omitted)). The plaintiff satisfies her burden to present a prima facie case by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Id.* (citing *Provident Nat'l Bank v. California Fed. Sav. & Loan Assoc.*, 819 F.2d 434, 437 (3d Cir.1987) (citation omitted)).

Two types of personal jurisdiction exist: general and specific. *Id.* at 612. For general jurisdiction to exist over a foreign corporation, its affiliations with the state must be so continuous and systematic as to render it essentially at home in the forum state. *See Daimler AG v. Bauman*, 571 U.S. 117, 138–39 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011)). The place of incorporation and principal place of business are "paradigm" bases for general jurisdiction. *Id.* at 137.

For purposes of specific jurisdiction, there are three essential components of the inquiry. *See O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). First, the defendant must have "purposefully directed" its activities at the forum. *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quotation marks omitted)). Second, the litigation must "arise out of or relate to" at least one of those activities. *Id*. Third, if the prior two requirements are met, a court may consider whether the exercise of jurisdiction otherwise comports with "fair play and substantial justice." *Id*. (citing *Burger King*, 471 U.S. at 476).

When a plaintiff claims that a defendant committed an intentional tort, the court must consider whether jurisdiction is appropriate under the "*Calder* effects test." *Vonbergen v. Liberty Mut. Ins. Co.*, No. CV 22-4880, 2023 WL 8569004, at *4 (E.D. Pa. Dec. 11, 2023) (citing *Calder* at 788–90). The traditional specific jurisdiction analysis and the *Calder* effects test are different, but they are cut from the same cloth; just as the standard test prevents a defendant from "be[ing] haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," the *Calder* effects test prevents a defendant from being haled into a jurisdiction solely because the defendant intentionally caused harm that was felt in the forum state if the defendant did not expressly aim his conduct at that state. *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007) (citing *Burger King*, 471 U.S. at 475 (citations and quotation marks omitted)).

### A. Prime is not subject to Pennsylvania's general jurisdiction because Prime is not "at home" in Pennsylvania.

Plaintiff has not alleged and cannot show that Prime is subject to the general jurisdiction of Pennsylvania courts because Plaintiff cannot establish that Prime has such "continuous and systematic" contacts with Pennsylvania as to render Prime at home in Pennsylvania. *Daimler*, 571 U.S. at 138–39 (citing *Goodyear*, 564 U.S. 924). The place of incorporation and principal place of business are "paradigm" bases for general jurisdiction. *Daimler*, 571 U.S. at 137. Prime is incorporated under the laws of Delaware and maintains its principal place of business in Kentucky. Further, Prime is not registered with the Commonwealth of Pennsylvania. Thus, because Prime does not have such "continuous and systematic" contacts with Pennsylvania as to be considered "at home," Prime is not subject to the Court's general jurisdiction.

### B. This Court lacks specific jurisdiction over Prime.

The exercise of specific jurisdiction over Prime is likewise improper under both the traditional specific jurisdiction analysis and the *Calder* effects test. Under both analyses, Plaintiff has failed to show that the activities alleged in Plaintiff's claim against Prime were directed at Pennsylvania.

#### a. <u>Prime is not subject to specific jurisdiction under the traditional analysis because Plaintiff has failed to show that Prime directed its activities to Pennsylvania.</u>

Under the traditional analysis for specific jurisdiction, Plaintiff must establish with reasonable particularity sufficient contacts between Prime and Pennsylvania. *See Steinfield*, 97 F. Supp. 3d at 611. Specifically, Plaintiff must demonstrate that (1) Prime purposefully directed its activities at the forum state, (2) the claim arises out of or relates to those activities, and (3) if the prior two requirements are met, that the exercise of jurisdiction otherwise comports with "fair

play and substantial justice." *O'Connor*, 496 F.3d at 317. Failing any of the three prongs of the traditional analysis is fatal to Plaintiff's claim against Prime.

Plaintiff has failed to show that Prime purposefully directed alleged activities at Pennsylvania. Rather, Plaintiff asserts generic, conclusory statements in an attempt to persuade the Court that personal jurisdiction is appropriate. (Compl. ¶¶ 12 - 16). Plaintiff (incorrectly) alleges that Prime "does not disclose its use[]of the Meta Pixel and Google Analytics" to "route[] Plaintiff's and Class Members' electronic communications to Meta and Google's own servers" from its Website (Compl. ¶¶ 91, 92). However, the Complaint is completely devoid of any facts asserting that Prime directed its use of said software *towards Pennsylvania*.

Instead, Plaintiff conclusively alleges that Prime "'avail[ed] itself of the laws of the Commonwealth of Pennsylvania' by conduct[ing] customer outreach including direct online outreach, marketing and sales, located in the Commonwealth of Pennsylvania." (Compl. ¶ 11). Plaintiff claims that because Prime "conduct[s] substantial and continuous business in the Commonwealth of Pennsylvania …[s]pecifically through direct online marketing, sales and shipping to the Commonwealth of Pennsylvania" that Prime's conduct was aimed at Pennsylvania residents (Compl. ¶ 10). This argument falls flat. As an initial matter, Prime's sales and marketing are not the subject of Plaintiff's claim; Plaintiff is not claiming that Prime misrepresented certain facts or otherwise committed tortious conduct in the manner in which it advertised. Rather, Plaintiff claims that Prime's *alleged interception of communications* constitutes a violation of Pennsylvania law.

Even if Prime's marketing was the subject of Plaintiff's claim, Plaintiff has failed to sufficiently plead that this marketing is more than a benefit of successfully accessing the United States as a national market. The Western District's opinion in *Zippo Manufacturing Co. v. Zippo*

*Dot Com, Inc.* has become the seminal authority regarding personal jurisdiction based on the operation of an internet website. 952 F. Supp. 1119 (W.D. Pa. 1997); *see also Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003) (citing *Zippo*, 952 F. Supp. at 1119). *Zippo* stressed that the propriety of exercising personal jurisdiction depends on the sliding scale of commercial interactivity and where the website falls on that scale. 952 F. Supp. at 1119. As *Zippo* and numerous cases thereafter illustrate, **the mere operation of a commercially interactive website cannot subject the website operator to jurisdiction anywhere in the world**. *See Toys "R" Us*, 318 F.3d at 454. In other words, Pennsylvania does not have jurisdiction over Prime if Prime's connection to Pennsylvania is merely a "derivative benefit of its successful attempt to exploit the United States as a national market." *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 104 (3d Cir. 2009). Rather, courts have "repeatedly recognized that there must be 'something more'…to demonstrate that the defendant directed its activity toward the forum state." *See Toys "R" Us*, 318 F.3d at 452 (citing *Desktop Technologies, Inc. v. Colorworks Reprod. & Design*, 1999 WL 98572, at *5 (E.D. Pa. Feb. 25, 1999)).

Setting aside the fact that marketing is not the basis of Plaintiff's claim, advertising its services on a national basis does not mean Prime "purposefully availed itself" of the laws of Pennsylvania. Plaintiff has not demonstrated "something more." Instead, Prime's website is only a "derivative benefit" of successfully accessing the United States as a national market. *Toys "R" Us*, 318 F.3d at 454 (citing *Desktop Technologies*, 1999 WL 98572, at *5; *D'Jamoos*, 566 F.3d at 104. Accordingly, Plaintiff has failed to show that Prime specifically directed any activity to the forum state, let alone the activity which is the basis of Plaintiff's claim against Prime. Thus, Plaintiff has failed to establish with reasonable particularity sufficient contacts to subject Prime

to specific personal jurisdiction in Pennsylvania, and Plaintiff's claim fails for lack of personal jurisdiction under the traditional analysis.

b. Prime is similarly not subject to specific jurisdiction under the *Calder* effects test because Plaintiff has failed to show that Prime aimed its activities at Pennsylvania.

Should the Court be inclined to apply the *Calder* effects test to this case, Plaintiff's allegations fail that analysis as well. Where there are allegations that a nonresident defendant committed an intentional tort outside the forum state, the unique effects of which caused damage to the plaintiff within the forum state, Pennsylvania precedent applies the "*Calder* effects test" to jurisdictional disputes, rather than the traditional analysis. *See IMO Indus.*, 155 F.3d at 256 (citing *Calder*, 465 U.S. 783).

Under the *Calder* effects test, a plaintiff must show that (1) the defendant committed an intentional tort, (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort, and (3) the defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. *See IMO Indus.*, 155 F.3d at 265–66. The Court should only consider prongs one and two of the effects test if the third prong is met. *See Marten*, 499 F.3d at 298 (citing *IMO Indus.*, 155 F.3d at 266).

To satisfy the third prong, the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum. *See IMO Indus.*, 155 F.3d at 266. If the plaintiff fails to show that the defendant "manifested behavior intentionally targeted at and focused on the forum," then the plaintiff fails to establish jurisdiction under the effects test. *Marten*, 499 F.3d at 298 (citing *IMO Indus.*, 155 F.3d at 265).

Less than two weeks ago, the Third Circuit held that a plaintiff does not "aim" its activities at Pennsylvania "merely by operating a website that is accessible there – even when the plaintiff alleges harm in that forum arising out of [her] engagement with that website." *Hasson v. FullStory, Inc.*, No. 23-2535, 2024 WL 4049220, at *5 (3d Cir. Sept. 5, 2024). In *Hassan*, the plaintiff alleged that Papa Johns was subject to jurisdiction in Pennsylvania because Papa Johns knew that Pennsylvania residents would use its website, had a "store locater" function on its website, advertised nationally, had stores in Pennsylvania, and the alleged "interception" of plaintiff's data occurred in Pennsylvania. *Id.* at *5-*6. The Third Circuit rejected these arguments, both under the *Calder* test and the traditional test. *Id.* at *5-*9. As the Court explained, the plaintiff's allegations of a widespread "wiretap" scheme were not sufficiently "aimed" at or tailored to Pennsylvania, as required to satisfy the personal jurisdiction analyses:

> The District Court held that Schnur did not satisfy *Calder's* "effects" test because he did not allege that Papa Johns expressly aimed Session Replay Code at Pennsylvania. We agree. Schnur alleged that Papa Johns "knowingly armed [its] website with software that initiates a broad-spectrum wiretap" and that this conduct "led to [his] lawsuit being filed." Dist. Ct. Dkt. No. 31, at 10. **But Schnur did not allege that Papa Johns' website is accessible only in Pennsylvania, that the company deploys Session Replay Code only to users who access the site while in Pennsylvania, or that the website tailors its content in any meaningful way to Pennsylvanians.** Rather, Schnur admits that Papa Johns targets a "national audience" "to drive customers to its website." Schnur App. 39. And we, like several sister courts, have held that a defendant does not expressly target a forum merely by operating a website that is accessible there—even when the plaintiff alleges harm in that forum arising out of his engagement with that website.

*Id.* at *5. Like pizza, Prime drinks "ha[ve] national appeal." *Id.* at *5. Plaintiff has not alleged that Prime's products were somehow tailored towards Pennsylvania residents or that it advertises any product specific to Pennsylvania. *Id.* Nor is "transmitting computer code to a browser that happens to be in Pennsylvania" "an intentional physical entry into the forum sufficient to establish express aiming under *Calder*." *Id.* at *6 (citing *Carefirst of Maryland, Inc. v. Carefirst*

*Pregnancy Ctrs.*, Inc., 334 F.3d 390, 401 (4th Cir. 2003) (Defendant "did not ... direct electronic activity into [the forum] with the manifest intent of engaging in business or other interactions within that state in particular" by "set[ting] up its generally accessible, semi-interactive Internet website.")). Further, the Third Circuit has previously "rejected the argument that the 'expressly aiming' requirement is satisfied when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Id.* at *10 (citing *Budget Blinds, Inc. v. White*, 536 F.3d 244, 264 (3d Cir. 2008)).

In sum, Plaintiff's Complaint fails to show jurisdiction under the *Calder* effects test for the same reasons that it fails to show jurisdiction under the traditional analysis: Plaintiff cannot demonstrate that Prime's use of Meta Pixel and Google Analytics was "aimed" at or "intentionally targeted" toward Pennsylvania. Even if Plaintiff could show that Prime targeted its use of the technology toward Pennsylvania, which Prime specifically denies, Plaintiff nonetheless has failed to demonstrate that Prime knew that Plaintiff would suffer the brunt of the harm allegedly caused by the use of this technology in Pennsylvania. Because Plaintiff has not met the requirements set forth in the third prong of the *Calder* effects test, the Court need not consider the first two prongs, and the exercise of specific jurisdiction over Prime is improper.

Accordingly, Plaintiff's claim against Prime fails for lack of personal jurisdiction over Prime and must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2).

## II. Plaintiff Lacks Standing to Bring A Claim Against Prime Because She Does Not Allege "Concrete" Harm.

Plaintiff's allegation that Prime violated WESCA does not establish an injury in fact sufficient to confer Article III standing. Standing is a prerequisite for a federal court's subject matter jurisdiction, and a motion to dismiss for lack of standing is proper under Federal Rule of Civil Procedure 12(b)(1). *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). To

establish standing under Article III, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

To establish an injury in fact, the plaintiff must "show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339. "That a suit may be a class action … adds nothing to the question of standing, for even named Plaintiff who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" *Id*. at 338 n.6.

Article III requires that a Plaintiff's injury in fact "be 'concrete'—that is, 'real, and not abstract.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). As the Supreme Court recently reiterated in *TransUnion*, this is the case "even in the context of a statutory violation." *Id*. at 426. Specifically, *TransUnion* "rejected the proposition that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id*. (citation omitted). In doing so, the Court explained that "an injury in law is not an injury in fact. Only those Plaintiff who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id*. at 427. In assessing whether the purported harm caused by a statutory violation is sufficiently concrete, courts must consider whether the alleged harm bears "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id*. at 424.

Plaintiff has not met her burden to establish standing because she has not pled allegations of having suffered a concrete harm resulting from her visit to Prime's website, nor can she under

Pennsylvania precedent. Here, Plaintiff asserts that her "harm" from Prime's alleged violation of WESCA is invasion of privacy. (Compl. ¶¶ 14, 16). But under Pennsylvania precedent, this harm cannot constitute an injury sufficient to establish Article III standing.

When faced with nearly identical allegations and the same argument under WESCA, the Western District of Pennsylvania held in *Cook v. GameStop, Inc.* that this "circular reasoning simply folds back onto a bare statutory violation, which the Supreme Court has clarified cannot be the basis for standing." 689 F. Supp. 3d 58, 64 (W.D. Pa. 2023). In *Cook*, the plaintiff asserted a putative class action against an online retailer, asserting a claim under the Act and intrusion upon seclusion arising from the retailers' use of a program that recorded, saved, and replayed visitor interactions with the online website. *Id*. The *Cook* plaintiff asserted that the act of the wiretap intruded upon her privacy and is both injury under the statute and the basis for harm for "invasion of privacy." *Id*. In other words, the *Cook* claimant (and Heaven in this case) asserted that a violation of the wiretapping statute should constitute a harm, meaning that the Court's analysis should "begin and end with the statutory violation." *Id*.

The *Cook* court rejected this argument, stating that the claimant's argument is "no longer viable," in light of the "Supreme Court's clarification that a 'legislature's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III.'" *Id*. (citing *Lightoller v. Jetblue Airways Corp.*, No. 23-361, 2023 WL 3963823, at *3 (S.D. Cal. June 12, 2023) (citing *TransUnion*, 594 U.S. at 423)). "To put a fine point on it: 'a bare statutory violation by itself is insufficient to demonstrate Article III injury in fact.'" *Cook*, 689 F. Supp. 3d at 64 (quoting *Lightoller*, 2023 WL 3963823, at *3).

The only "injury" Plaintiff alleges here is the statutory violation itself. (Compl. ¶¶ 83-93). Under clear Pennsylvania precedent, this is not sufficient to withstand a motion to dismiss for lack of standing. Therefore, Plaintiff fails to allege a concrete harm under WESCA, and her claim must be dismissed.

Plaintiff attempts to circumvent this deficit in her Complaint by generally asserting that Prime invaded her privacy, and although she does not assert a common law invasion of privacy claim against Prime, she likewise fails to establish an injury in fact to confer Article III standing with these baseless allegations. (Compl. ¶¶ 14, 16). Plaintiff does not allege that she provided any highly sensitive personal information or financial information to Prime, so no such information could be collected from her use of Prime's website.

Although there are "certain harms" that readily qualify as concrete injuries under Article III, Plaintiff's alleged harms do not meet that threshold. *TransUnion*, 594 U.S. at 425. For example, "'traditional tangible harms, such as physical harms and monetary harms' are obviously concrete." *Id*. Other intangible harms are closer calls. *Cook*, 2023 WL 5529772, at *3. These harms can be concrete if "they bear 'a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts.'" *Id*. (citing *TransUnion*, 594 U.S. at 425).

Both the common law and literal understandings of privacy encompass an individual's control of information concerning his or her person. *See Cook*, 2023 WL 5529772, at *4 (citing *U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 763 (1989)). The information that Prime allegedly intercepted does not meet this threshold. Plaintiff states that her "search bar communications [on Defendant's website] were intercepted in transit by Meta and Google" and that those searches pertained to "different Prime drink flavors" (Compl. ¶ 8).

Plaintiff does not allege that any of her highly sensitive personal information or financial information was provided to Prime or intercepted by Meta or Google as enabled by Prime.

This is completely inadequate to establish Article III standing. Shopping on a public website, like shopping in a public store, is not an activity one can reasonably expect to keep private from the retailer. *See Farst v. AutoZone, Inc.*, 700 F. Supp. 3d 222, 230 (M.D. Pa. 2023). The mere fact that Plaintiff presumably used a personal laptop or cell phone to access Prime's website, rather than going into a public store, does not entitle her to a heightened expectation of privacy. *Id*. Based on her own allegations, Prime collected only a record of her visit to its website. The information did not include her name, email address, personal or sensitive information, financial information, or any highly sensitive information for which she could have a reasonable expectation of privacy or that caused her any actual harm.

Plaintiff cannot show that Prime harmed her in a "***personal and individual way,***" or that she sustained a concrete injury that "actually exist[s]" due to Prime's conduct. At most, she has only pleaded a "conjectural or hypothetical" or "abstract" theories – which are not sufficient to establish standing or concrete harm as to Prime. *Spokeo*, 578 U.S. at 338. "Eavesdropping on communications that do not involve personal information, personally identifiable information, or information over which a party has a reasonable expectation of privacy does not amount to a concrete injury." *Massie v. Gen. Motors LLC*, No. 21-CV-787, 2022 WL 534468, at *5 (D. Del. Feb. 17, 2022); *see also TransUnion*, 594 U.S. at 424; *Cook*, 689 F. Supp. 3d at 65; *In re BPS Direct, LLC*, 705 F. Supp. 3d 333, 351 (E.D. Pa. 2023) ("Website Users' argument we must ignore the sensitivity of the intercepted content when considering standing does not withstand scrutiny.").

The *BPS Direct* MDL court found that the plaintiffs whose sensitive personal information was not disclosed lacked standing and dismissed those claims with prejudice. 705 F. Supp. 3d at 355. The court held, "[w]e find Website Users who did not disclose highly sensitive personal information such as medical diagnosis information or financial data from banks or credit cards cannot establish concrete harm." *Id*. at 355. In other words, plaintiffs' allegations that the websites *can* collect personal data is insufficient if they did *not*, in fact, do so for those plaintiffs. *Id*. at 356 ("We need to know what session replay code *actually captured, not* what session replay code is *capable of* capturing." (emphasis added)). The *BPS Direct* court relied on the reasoning in *Adams v. PSP Grp., LLC*, 691 F. Supp. 3d 1031, 1040 (E.D. Mo. 2023), also with similar facts to the instant case:

> Judge White granted Pet Supplies' motion to dismiss for lack of standing because **Ms. Adams did not allege she input sensitive, personal, or confidential information while on the website, she did not allege she made a purchase on the website, and she did not allege she shared any financial information such as credit card details**.

*In re BPS Direct, LLC*, 705 F. Supp. 3d at 356 (citing *Adams*, 691 F. Supp.3d at 1040-1041) (emphasis added). Like the cited cases, Plaintiff Heaven "did not allege she input sensitive, personal, or confidential information while on the website, she did not allege she made a purchase on the website, and she did not allege she shared any financial information such as credit card details." *In re BPS Direct, LLC*, 705 F. Supp. 3d at 356; *Adams*, 691 F. Supp.3d at 1040-1041. Her claims, too, must be dismissed for lack of standing.

Not only did Plaintiff fail to demonstrate that Prime has any of her highly sensitive personal or financial information, but she cannot demonstrate any reasonable expectation of privacy in accessing Prime's website. Ultimately, Plaintiff has not established a "concrete" injury under either WESCA or a common law privacy harm that can satisfy the injury-in-fact

requirement under Article III standing. Consequently, Plaintiff's claim against Prime fails for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

### III. Plaintiff fails to state a claim against Prime under the Pennsylvania Wiretapping and Electronic Surveillance Control Act.

Plaintiff's sole claim against Prime is for an alleged violation of WESCA. But Plaintiff fails to state a viable claim for relief under WESCA. Dismissal is warranted under Federal Rule of Civil Procedure Rule 12(b)(6) when a plaintiff fails to allege facts sufficient "to raise a right to relief above the speculative level" or fails "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545, 547 (2007). This "plausibility" standard applies to all claims brought in federal court. *See Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009).

Although a court generally must accept well-pleaded facts as true on a motion to dismiss for failure to state a claim, this principle does *not* apply to legal conclusions, conclusory allegations, or unwarranted factual inferences. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. Assuming their veracity, the court must determine whether Plaintiff's well-pleaded factual allegations "plausibly give rise to an entitlement to relief." *Id.* Put another way, the complaint must present sufficient factual material to allege a claim that is "plausible on its face." *Twombly,* 550 U.S. at 570. Such facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In resolving a Rule12(b)(6) motion to dismiss, a court may look beyond the complaint to matters of public record and documents referenced in the complaint or those that are essential to a plaintiff's claim that are attached to a defendant's motion. *See Colbert v. Mercy Behav. Health*, 845 F. Supp. 2d 633, 637 (W.D. Pa. 2012) (citing *Pension Benefit Guar. Corp. v. White Consol.*

*Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)). Under this standard, these documents may be considered by the court without converting the motion to dismiss into a motion for summary judgment. *Id.* Here, the respective website privacy policies and terms and conditions are essential to Plaintiff's allegations and must be considered for the Motion to Dismiss.

"The WESCA offers a private civil cause of action to '[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of [that statute]' against 'any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication.'" *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125 (3d Cir. 2022) (citing 18 Pa. C.S. § 5725(a)). Here, Plaintiff fails to satisfy multiple elements required under WESCA. First, Plaintiff does not allege that Prime intercepted any "contents of a communication" entitled to protection under the Act. Second, as with her deficient standing under Article III, Plaintiff has not sufficiently pled or demonstrated any injury or harm. Third, Plaintiff consented to the use of cookies and third-party data collection through her voluntary use of Prime's website, as well as through her creation of a Facebook account ten years earlier. Accordingly, Plaintiff's Complaint must be dismissed as a matter of law.

### A. Browsing activity and keystrokes are not "contents of a communication" protected under the Act.

To state a viable claim under WESCA, Plaintiff must demonstrate that Prime intercepted the contents of her communications without her consent. The statute defines "intercept" as the "[a]ural or other acquisition of the ***contents*** of any wire, electronic or oral ***communication*** through the use of any electronic, mechanical or other device." 18 Pa. C.S. § 5702 (emphasis added). "Contents" is defined as "any information concerning the substance, purport, or meaning of that communication." *Id.*

Courts interpreting alleged wiretap statute violations often distinguish between "a record or other information pertaining to a . . . customer" (known as 'record information') and the contents—*i.e.*, 'substance, purport, or meaning'—of the communication itself." *See Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) ("The touchtone in many cases arising under [Florida's wiretap statute] and similar statutes is the definition of contents. Courts interpreting contents under the [federal wiretap statute] distinguish between a record or other information pertaining to a customer (known as 'record information') and the contents—*i.e.*, 'substance, purport, or meaning'—of the communication itself.").

Keystrokes, website movement, and similar activity do not constitute "contents of a communication" under the meaning of the Wiretapping Act. *See e.g.*, *Farst*, 700 F. Supp. 3d 222, 230; *Cook*, 689 F. Supp. 3d 58, 70 ("When a website user moves the cursor or clicks the mouse, it does not plausibly reveal the substance of any communication. . . . Navigating through a website's multiple pages is not the substance of a communication; it's an action taken to go to a digital location."). Comparing this to a customer visiting a brick-and-mortar store, the keystrokes and mouse movement are similar to customer movements that a salesperson or security camera might observe about the customer's preferences while at the store. *See Goldstein*, 559 F. Supp. 3d at 1321. But they are not "contents of communication" within the meaning of the Act.

Unlike the plaintiff in *Popa*, Heaven does not allege that she provided any highly sensitive personal information on Prime's website, rather she alleges that she used the search bar on Prime's website to search for different Prime drink flavors (Compl. ¶ 8). Plaintiff's Complaint against Prime does not allege that any "contents of a communication" were collected by Prime. For this reason alone, she fails to state a viable claim against Prime under WESCA.

**B. Plaintiff has not pled or demonstrated any injury or harm.**

Just as Plaintiff lacks Article III standing, she has no injury or harm that would allow her to pursue a claim under WESCA. Again, "[o]nly those Plaintiff who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 594 U.S. at 426 (emphasis in original); *Lightoller*, 2023 WL 3963823, at *4; *Byars v. Sterling Jewelers, Inc.*, No 5:22-CV-1456, 2023 WL 2996686, at *3 (C.D. Cal. Apr. 5, 2023). "Eavesdropping on communications that do not involve personal information, personally identifiable information, or information over which a party has a reasonable expectation of privacy does not amount to a concrete injury." *Massie v. Gen. Motors LLC*, No. 21-CV-787, 2022 WL 534468, at *5 (D. Del. Feb. 17, 2022); *see also TransUnion*, 594 U.S. at 424; *Cook*, 689 F. Supp. 3d at 65; *In re BPS Direct, LLC*, 705 F. Supp. 3d at 351.

In *Farst*, the plaintiff alleged that AutoZone used session replay software on its website that allowed the retailer, using a third-party provider and outside vendor, to "contemporaneously observe, record, and store visitors' interactions with the website the moment they access the site." 700 F. Supp. 3d at 227. The plaintiff claimed that AutoZone used the data to "better understand website visitors' shopping habits and preferences." *Id.* When the plaintiff visited the website, "AutoZone allegedly recorded Farst's mouse clicks and movements, keystrokes, search terms, information inputted by [him], pages and content viewed by [him], scroll movements, and copy and paste actions." *Id.* at 229. The plaintiff claimed that the session replay software "revealed personalized and sensitive information about [Farst's] internet activity and habits" and allowed AutoZone to "capture, observe, and divulge [his] personal interests, browsing history, queries, and habits." *Id.* at 227. As here, the plaintiff filed a complaint against the retailer, alleging violation of WESCA on behalf of himself and others similarly situated. *Id.*

The Middle District of Pennsylvania rejected the plaintiff's claims and granted AutoZone's motion to dismiss for lack of any concrete harm. The Court initially noted that "Farst's allegations involve the novel application of WESCA in the online shopping context. This is clearly not something that has 'long been seen as injurious.'" *Id.* at 229 (citing *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 111 (3d Cir. 2019); *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 638 (3d Cir. 2017)). Just like the analysis of standing under Article III, the Court rejected the argument that the plaintiff had an expectation of privacy concerning his online shopping activities, comparing them to shopping in a brick-and-mortar store:

> Shopping on a public website, like shopping in a public store, is not an activity one can reasonably expect to keep private from the retailer. *See Cook*, —— F.Supp.3d at ——, 2023 WL 5529772, at *5. The mere fact Farst used "a personal laptop or cell phone" while "sit[ting] in the privacy of his home" does not entitle him to a heightened expectation of privacy. (See Doc. 49 at 4-5). **The difference in fora between online and in-person shopping outlets does not transform the generally public nature of shopping into a "private affair."** See RESTATEMENT (SECOND) OF TORTS § 652B. Reasonable people understand that what they "do on the Internet is not completely private. How could it be?" *See Nickelodeon*, 827 F.3d at 266. Farst's visits to AutoZone's commercial website are not exempt from this basic truth. Other courts within our circuit have similarly found that a company's tracking of a customer's shopping activity using session replay software is not closely related to the tort of intrusion upon seclusion. *See Cook*, —— F.Supp.3d at —— – ——, 2023 WL 5529772, at *4-5; *Massie v. Gen. Motors LLC*, No. 21-CV-787, 2022 WL 534468, at *5 (D. Del. Feb. 17, 2022). We echo their compelling analyses.

*Farst*, 700 F. Supp. 3d at 230 (emphasis added). The Court also noted that its analysis is supported by "[v]arious courts in other circuits [that] have reached the same conclusion based on similar allegations." *Id.* at 230, n.3 (citing *Popa v. PSP Grp., LLC*, No. 23-294, 2023 WL 7001456, at *1, 4 (W.D. Wash. Oct. 24, 2023); *Jones v. Bloomingdales.com, LLC*, No. 4:22-CV-1095, 2023 WL 6064845, at *2 (E.D. Mo. Sept. 18, 2023); *Adams*, 691 F. Supp.3d at 1040-1041; *Straubmuller v. Jetblue Airways Corp.*, No 23-CV-384, 2023 WL 5671615, at *4-5 (D. Md. Sept. 1, 2023); *Mikulsky v. Noom, Inc.*, 682 F. Supp. 3d 855 (S.D. Cal. 2023); *Lightoller*, 2023

WL 3963823, at *4; *Byars*, 2023 WL 2996686, at *3; *see also I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034, 1049-50 (N.D. Cal. 2022); *Goldstein*, 559 F. Supp. 3d at 1321).

Like Plaintiff Heaven in this case, "Farst does not aver AutoZone disclosed his home address, credit card, bank account, social security number, or any other information that could potentially be used to identify him or materially increases his risk of future harm." *Id.* at 231 (citing *Cook*, 689 F.Supp.3d 65-66, *Massie*, 2022 WL 534468, at *5; *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 155 (3d Cir. 2022)). Rather, "[m]aking 'scroll movements,' viewing 'pages and content,' and engaging in 'mouse clicks and movements' are the online analogues of walking down aisles, looking at inventory, and handling products. Farst's shopping activity on AutoZone's website betrays no 'private facts' about him." *Id.* at 232. As in *Farst*, Plaintiff has failed to demonstrate, or even allege, that Prime has any of her personal information. She has not pled that any of her sensitive private information was disclosed. Plaintiff cannot credibly claim the alleged collection of her user activity constituted an injury or harm. Plaintiff has not pled or shown that she has sustained any compensable harm caused by any activity by Prime. Her claims must be dismissed for this reason as well.

### C. Plaintiff consented to Prime's Privacy Policy by voluntarily using Prime's website, and she agreed to Meta's collection of her browsing activity.

Plaintiff has also failed to state a claim against Prime under WESCA because she voluntarily used Prime's website. Any internet user in the modern age has a reasonable expectation that cookies may be used to track the user's activities on a website. Further, Prime's website contains **<u>clear statements</u>** that Prime may conduct the collection of information about which Plaintiff complains. Specifically, Prime's website provides:

> **Cookies (or browser cookies).** A cookie is a small file placed on the hard drive of your computer. ***You may refuse to accept browser cookies by activating the appropriate setting on your browser***. However, if you select this setting you may

> be unable to access certain parts of our Site. Unless you have adjusted your browser setting so that it will refuse cookies, our system will issue cookies when you direct your browser to our [*sic*].
>
> **Third Party Use of Cookies and Other Tracking Technologies.** Some content or applications, including advertisements, on the Site is served by third parties, including advertisers, ad networks and servers, content providers, and application providers. ***These third parties may use cookies to collect information about you when you use our Site.*** The information they collect may be associated with your personal information or they may collect information, including personal information, about your online activities over time and across different Sites and other online services. They may use this information to provide you with interest-based (behavioral) advertising or other targeted content. ***We do not control these third parties' tracking technologies or how they may be used. If you have any questions about an advertisement or other targeted content, you should contact the responsible provider directly.***

(emphasis added).

WESCA includes an exception from liability for situations involving "all-party" consent: it is not unlawful to "intercept a wire, electronic or oral communication, where all parties to the communication have given prior consent to such interception." 18 Pa. C.S. § 5704(4). Thus, even if Plaintiff had adequately alleged a claim against Prime for violation of WESCA, which she has not, she consented to Prime's conduct by choosing to use its website. *Popa*, 52 F.4th at 132.

In *Popa*, the Third Circuit discussed the concept of implied consent to website terms and conditions, but the Court ultimately did not reach a conclusion because the district court had granted summary judgment on other grounds and never addressed the consent arguments. Nonetheless, the Third Circuit noted that the failure to read terms and conditions is not dispositive with respect to consent:

> The Defendants argue Popa impliedly consented to the interception because Harriet Carter included a privacy policy on the website when she visited. Though Popa claims she never saw the policy, the Pennsylvania Supreme Court has said that **"prior consent" in § 5704(4) does not require "actual knowledge."** *Commonwealth v. Byrd*, ––– Pa. ––––, 235 A.3d 311, 319 (2020).

*Id.* (emphasis added). As the Court stated, express consent in the context of website terms and conditions is not a prerequisite to the "all party" exception to WESCA. "Prior consent, including implied consent, can be demonstrated when the person being recorded knew or should have known[ ] that the conversation was being recorded." *Id.* (internal quotation marks omitted). Ultimately, the court stated that "these are arguments that should be addressed first by the District Court." *Id.* at 132. The logic of the Third Circuit's statements is fatal to Plaintiff's claim against Prime, and Plaintiff's failure to read the Privacy Policy does not save her claim.

As the *Farst* Court stated, "[r]easonable people understand that what they 'do on the Internet is not completely private. How could it be?'" *Farst*, 700 F. Supp. 3d at 230 (citation omitted). "Farst's decision to visit AutoZone's publicly accessible website rather than its physical store did not increase his expectation of privacy or expose him to a concrete harm that otherwise did not exist." *Id.* at 232. Indeed, any internet user in the modern age has a reasonable expectation that websites may use cookies to track the user's activities on the website. The Privacy Notice on Prime's website make this explicitly known to the user that Prime, or third parties, may automatically collect information or inferences about the user through tracking technologies such as cookies. Given that she allegedly visited Prime's website, Plaintiff knew or should have known that Prime may be collecting information consistent with its Privacy Policy. As a result, Plaintiff cannot maintain a claim against Prime under WESCA.

And importantly, in addition to her implied consent in using Prime's website, Plaintiff explicitly consented to Meta's collection of her browsing activity and even her personal information. "Meta has several policies governing how it collects and uses data, including through the Pixel." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 786 (N.D. Cal. 2022). "When individuals sign up for a Facebook account, they agree to Meta's Terms of Service,

Data Policy, and Cookies Policy." *Id*. "These policies are contractually binding on both Meta and its users." *Id*. In other words, by virtue of being a Facebook user, Plaintiff had previously agreed to Meta's policies, which "notify Facebook users that Meta collects and uses their personal data, including data about their browsing behavior on some third-party websites, at least in part for targeted advertising." This includes her activities online, whether or not she was logged-in to Facebook at the time of those activities. *See id*. (citing Meta's Terms of Service at 4 (providing that Meta "collect[s] and use[s] your personal data"); Data Policy at 4–5 (explaining that third-parties which are partnered with Meta "provide information about your activities off of our Products"); Cookies Policy at 4 (providing that Meta's "business partners may also choose to share information with Meta")).

Because Plaintiff fails to satisfy multiple elements of a claim under WESCA, her Complaint should be dismissed with prejudice.

**IV. <u>Plaintiff's Complaint must be dismissed for failure to join Meta and Google as necessary and indispensable parties.</u>**

Finally, Plaintiff's Complaint should be dismissed due to her failure to name necessary parties Meta and Google. Fed. R. Civ. P. 12(b)(7) provides that a complaint may be dismissed where the plaintiff failed to join a party pursuant to Fed R. Civ. P. Rule 19. When determining if joinder is required, the court should look to the criteria set forth in Rule 19 to determine if a case should proceed to a decision on the merits or should be dismissed for failure to join an indispensable party. *See Gen. Refractories Co. v. First State Ins. Co., 500 F.3d 306 (3d Cir. 2007).* Rule 19 is not to be applied in a rigid matter; rather, the court should examine the practicalities of each individual case. *See Provident Tradesman Bank & Trust Co. v. Patterson,*

390 U.S. 102, 116 n.12 (1968). However, under Rule 19(a), "the joinder of parties is compulsory or 'necessary' if their joinder is 'feasible.'" *Gen. Refractories Co.*, 500 F.3d at 312.

Rule 19(a) lays out a three-step test for determining whether an absent party must be joined. *Id.* The first step is to determine whether the absent party is "necessary" to the action. *Id*. Next, if the absent party is necessary, the court shall determine whether joinder is "feasible inasmuch as it would [not] defeat diversity of citizenship." *Id.* Third, if joining the absent party is not feasible, the court must determine whether the absent party is "'indispensable' under Rule 19(b)." *Id*. If the last inquiry be answered "in the affirmative, the action cannot go forward." *Id*. In the present case, both Meta and Google are necessary parties and joinder is feasible.

### A. Meta and Google are "necessary" parties to this action pursuant to Rule 19(a)(1)(B)

"Rule 19 is designed to protect the interest of the absent person, as well as those already before the court, from duplicative litigation, inconsistent judicial determinations, or other practical impairment of their legal interest." *Hammon v. Clayton*, 83 F.3d 191, 195 (7th Cir. 1996); *see also Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80 F.4th 223, 233 n. 13 (3d Cir. 2023) (stating "that district courts possess power to protect the interests of absent parties."). Rule 19 does not require that an absent party satisfy both conditions set out in Rule 19(a). Rather these conditions are disjunctive and only one must be satisfied for the absent party to be determined "necessary" to the action. *See Gen. Refractories Co*., 500 F.3d at 312. Here, the nature of Plaintiff's claim renders both Meta and Google necessary parties to this action.

Under Rule 19(a)(1)(B)(i), "the court must decide whether determination of the rights of those persons named as parties to the action would impair or impede an absent party's ability to protect its interest in the subject matter of the litigation" *Id.* at 316. To phrase it another way, an absent party is necessary if "some outcome of the [] case that is reasonably likely can preclude

the absent party with respect to an issue material to the absent party's rights or duties." *Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.*, 11 F.3d 399, 409 (3d Cir. 1993).

It is perplexing that Plaintiff did not name either Meta or Google as defendants in this matter as the majority of Plaintiff's Complaint focuses on how Meta and Google, rather than Prime, operate to allegedly intercept internet communications in violation of WESCA. (Compl. ¶¶ 27 – 73). Indeed, the majority of Plaintiff's Complaint concerns her explanation of *how* these two companies operate to track and collect data. (Compl. ¶¶ 27 – 73). The only information Plaintiff inputted on Prime's website were product search terms – not any highly sensitive personal or financial information. Thus, any such information collected by Meta or Google, if any, came from other sources or from Plaintiff's own creation of her Facebook account. If Plaintiff's claims against Prime were allowed to proceed, Meta and Google are central to all of her allegations and should be included as necessary parties to the litigation.

Meta and Google have an interest in the present litigation as Plaintiff contends that Prime's alleged use of Meta and Google's products, Meta Pixel and Google Analytics, constitute violations of WESCA. Accordingly, any ruling could potentially impact Meta and Google's rights to continue to further develop, utilize, and sell Meta Pixel and Google Analytics.

Specifically, Plaintiff alleges that Meta, not Prime, collects and intercepts user information from Prime's Website, and then processes, analyzes and assimilates it into datasets and that "Meta has the capability to use the information that it wiretaps for purpose other than simply providing a recording to its customers" (Compl. ¶¶ 35-36, 45).

With regard to Google, Plaintiff alleges that "'Google Analytics is a platform that collects data from [] websites and apps to create reports that provided insights' for businesses. This is made possible by the Google Analytics Pixel, a piece of code installed on a website that collects

information on how website users interact with a business website" and that Google, not Prime, uses this technology to surveil communications on their partners' websites and "directly receives the electronic communications of website visitors" (Compl. ¶¶ 48 -51). The Complaint further provides that "[o]nce Google intercepts website communications, it has the capability to use such information for its own purposes." (Compl. ¶ 53).

Echoing the United States Supreme Court in *Provident Tradesmens Bank & Tr. Co. v. Patterson*,[3] the Court in *H. H. Robertson Co. v. Lumbermen's Mut. Cas. Co.*,[4] noted that "[i]t is not necessary that the absent party be bound by the prospective judgment in the case in a technical sense. It is enough if the rights of the absent party will be affected as a practical matter." Here, as a practical matter, the Court cannot make rulings as to whether Prime violated WESCA, as alleged in the Complaint, without implicitly deciding whether use of Meta Pixel or Google Analytics is a violation of Pennsylvania law. In fact, her allegations concern how Meta and Google Analytics handled her information received from other sources – because she admits that she did not provide any highly sensitive personal information or financial information to Prime. (Compl. at ¶8). Because the disposition of Plaintiff's claim would inevitably decide issues directly affecting Meta and Google's interests, those interests would be impaired or impeded unless they are joined in this lawsuit. Consequently, Meta and Google are necessary parties pursuant to Rule 19(a)(1)(B)(i).

**B. Jurisdiction over Meta and Google would not defeat diversity.**

Meta is a Delaware corporation with its principal place of business in Menlo Park, California. Google is a Delaware corporation with its principal place of business in Mountain View, California. As such, Meta and Google are not citizens of the same state as Plaintiff.

[3] 390 U.S. 102, 110, 88 S. Ct. 733, 738, 19 L. Ed. 2d 936 (1968)
[4] 94 F.R.D. 578, 580 (W.D. Pa.)*aff'd sub nom. H.H. Robertson Co. v. Lumbermens Mut. Cas. Co.*, 696 F.2d 982 (3d Cir. 1982).

Moreover, the damages Plaintiff seeks are in excess of $75,000.00, exclusive of interest and costs, as evident from the Complaint. Consequently, the joinder of Meta and Google as additional defendants in this lawsuit would maintain the diversity jurisdiction that already exists under 28 U.S.C. §1332.

Thus, because Meta and Google are required parties, they should be joined as additional defendants in the present action pursuant to Rule 19(a).

**CONCLUSION**

For these reasons, Prime respectfully requests that this Court dismiss Plaintiff's Complaint because (1) Prime is not subject to the Court's personal jurisdiction, (2) Plaintiff lacks Article III standing, (3) Plaintiff has failed to state claim under WESCA for which relief may be afforded, and (4) Meta and Google are necessary parties to this action under Federal Rule of Civil Procedure 19(a). Consequently, Plaintiff's Complaint should be dismissed in its entirety.

Respectfully submitted,

Dated: September 16, 2024

*/s/ Tara Hopper Rice*

Tara Hopper Rice
ID# 313724

**FROST BROWN TODD LLP**
Union Trust Building
501 Grant Street, Suite 800
Pittsburgh, Pennsylvania 15219
(412) 513-4300 (phone)
(412) 513-4299 (facsimile)
trice@fbtlaw.com

*Attorney for Defendant Prime Hydration LLC*

**CERTIFICATE OF SERVICE**

I, TARA HOPPER RICE, ESQUIRE, certify that on this date, the foregoing Motion to Dismiss Plaintiff's Complaint has been filed electronically, and is available for viewing and downloading from the ECF System, has been served via the Court's electronic filing service on all counsel of record, and/or was also served via USPS on the following parties who have not consented to electronic service:

Mark C. Atlee, Esquire
ATLEE HALL, LLP
415 North Duke Street
Lancaster, PA 17602
Mcatlee@atleehall.com

Alec M. Lesile
Max S. Roberts
BURSOR & FISHER, P.A.
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
aleslie@bursor.com
mroberts@bursor.com

*Counsel for Plaintiff Shantay Heaven and the Proposed Class*

Dated: September 16, 2024

By: */s/ Tara Hopper Rice*
Tara Hopper Rice